**THIRD DIVISION
DOYLE, P. J.,
GOBEIL, J., and SENIOR APPELLATE JUDGE PHIPPS**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**June 29, 2023**

# In the Court of Appeals of Georgia

A23A0438. WHITAKER FARMS, LLC v. FITZGERALD FRUIT
      FARMS, LLC.

GOBEIL, Judge.

In the second appearance of these parties before this Court, Whitaker Farms, LLC appeals from a jury verdict granting punitive damages and attorney fees to Fitzgerald Fruit Farms, LLC ("Fitzgerald Farms"). On appeal, Whitaker Farms asserts that the trial court committed evidentiary errors that allowed the jury to hear inadmissible evidence; incorrectly directed the jury to take certain facts as established, when they were in fact in dispute; erroneously denied its motions for a directed verdict and for a new trial on punitive damages; erroneously allowed uncapped punitive damages; and incorrectly charged the jury in the first phase of the

trial. For the reasons set forth below, we affirm the jury's verdict as to punitive damages and associated attorney fees.

Following a jury trial, we construe the evidence in the light most favorable toward the prevailing party and resolve all conflicts against the non-prevailing party. *Intl. Images, Inc. v. Smith*, 171 Ga. App. 172, 172 (318 SE2d 711) (1984). As described in our previous opinion in this case, these parties proceeded to a jury trial after Fitzgerald Farms sued Whitaker Farms for trespass after Whitaker Farms's property manager locked the gates to the peach orchard where Fitzgerald Farms was harvesting peaches. *Whitaker Farms, LLC v. Fitzgerald Fruit Farms, LLC*, 347 Ga. App. 381 (819 SE2d 666) (2018) ("*Whitaker I*").

Briefly, the evidence at the first trial, as described in *Whitaker I*, showed that Sean Lennon, the owner of Fitzgerald Farms, had worked for Carroll Farms since high school, and began working for Carroll Farms full-time in 2003 after completing his education. 347 Ga. App. at 381. Carroll Farms was owned by Lennon's teacher and her son Walter "Hynes" Barnes. Id. Sometime in 2006, Hynes and his mother agreed to allow Lennon to grow Baby Gold peaches on a 20-acre tract of Carroll Farms. Id. The parties had an "oral handshake deal" for Lennon to lease the 20-acre tract for the economic life of the peaches (10-15 years). Id. At some point, a written

2

lease was executed, and Lennon obtained crop insurance for at least 2013 to 2016. Id. & n. 1.

Unbeknownst to Lennon, in October 2015, Hynes sold 290 acres of Carroll Farms, including the 20-acre tract used by Lennon, to Curtis Whitaker ("Curtis") and his company, Whitaker Farms. Id. at 382. At closing, Hynes and his mother signed an affidavit stating that the property was subject to no leases. Id. Hynes stayed on to manage the property for Whitaker Farms. Id. After the sale, Lennon and his workers began to prepare to harvest the peaches on Lennon's 20-acre tract. Id. Lennon and his workers were on the property consistently from December 2015 through July 2016 and observed Hynes on the property, who never spoke to them. Id. On August 3, 2016, Lennon's crew moved equipment onto the property for the next day's harvest. Id. at 382-383. At some point the next day, the workers realized that all the gates to the orchard had been locked; Lennon's lock had been removed and replaced with a combination lock that Lennon's workers could not open. Id. at 383. Lennon's workers were locked inside the orchard. Id.

Lennon's workers contacted Lennon, who immediately texted Hynes to ask if he could unlock the gate. Id. Hynes advised that Lennon needed to contact Curtis, the new owner of the property, which Lennon did, leaving a voice mail asking Curtis to

3

contact him. Id. Lennon also called the Sheriff's Office. Id. at 383. Hynes called Curtis himself to inform him that Lennon was trying to get into the orchard. Id. Curtis did not contact Lennon and did not respond to Lennon's call, believing Lennon to have no right to harvest peaches on the property. Id. at 383-384. Eventually, the sheriff cut the lock, allowing Lennon's workers to leave the property. Id. at 384. Fitzgerald Farms sought injunctive relief to access the orchard immediately to salvage the harvest, and Curtis executed an application for a criminal arrest warrant against Lennon to keep him off the property. Id. Fitzgerald Farms was granted a temporary restraining order to access the peaches, but the crop was ruined by the time the workers arrived. Id.

Fitzgerald Farms sued for trespass and attorney fees, seeking not less than $90,000 in actual damages and punitive damages. Id. at 384. Before the trial began, the trial court ruled that Fitzgerald Farms could not seek punitive damages against Whitaker Farms, reasoning that Curtis was not the person who locked Lennon's workers in the orchard,[1] and although he may have ratified Hynes's actions, that would not allow the jury to extrapolate a claim for punitive damages. Id. The jury

[1] Hynes was initially named as the defendant in the action, but Whitaker Farms was allowed to intervene and Hynes was dismissed without prejudice at the consent of the partes. *Whitaker I*, 347 Ga. App. at 384.

4

found in favor of Fitzgerald Farms, awarding it $150,000 in compensatory damages and $400,000 in OCGA § 13-6-11 attorney fees, which was reduced by the trial court to $272,000. Id. at 384-385. Both parties appealed, and we affirmed the verdicts for liability and attorney fees, id. at 385-388 (1), (2), (3), but reversed the trial court's ruling that withdrew the issue of punitive damages from the jury, id. at 389 (4) (b). We found that the actions taken by Curtis, including keeping the gates locked while the peaches rotted and executing the arrest warrant application against Lennon, were "sufficient evidence of 'conscious indifference' to authorize a jury to award punitive damages." Id. at 389 (4) (b).

On remand, the parties prepared for a new trial on the issue of punitive damages. Whitaker Farms filed several motions in limine seeking to exclude certain evidence, including as relevant to this appeal (1) "evidence relating to any actions, events, or statements that occurred after the end of the purported lockout on August 4, 2016"; and (2) "evidence regarding settlement communications or discussions." Fitzgerald Farms sought to include facts established at the first trial to limit the issues for the jury at the second trial. Fitzgerald Farms argued that the facts as described in *Whitaker I* constituted the "law of the case" and Whitaker Farms could not use the second trial to relitigate facts concerning its liability.

5

The trial court held a hearing on these motions but reserved its ruling. Before trial, the court sent to counsel for both sides a draft of the findings from the previous trial and preliminary instructions it intended to read to the jury. Whitaker Farms objected to several of the trial court's proposed instructions. Before the trial began, the trial court ruled on the motions in limine. As relevant here, the trial court denied Whitaker Farms's motion to exclude evidence of events that occurred after the lockout, finding Curtis's actions to let the peach orchard rot after the conflict with Lennon to be relevant to his intent. The trial court also denied Whitaker Farms's motion to exclude a statement made by Curtis to Lennon during an alleged settlement negotiation. Throughout the discussion of Whitaker Farms's motions in limine, the parties discussed extensively what facts were found by the first jury and what could or could not be relitigated at the second trial.

At the opening of the trial, the court explained to the jury that there was a previous trial in the case, and what the verdict was in that trial, including the damages awarded to Fitzgerald Farms. The trial court explained:

> Whether or not punitive damages should be awarded in this case is now a matter for this jury, in your sole discretion, to determine. In situations such as this, we are not required to retry the entire case and you have

6

been empaneled to decide the limited issue of punitive damages and any issues related to the claim for punitive damages.

The court then read 27 facts that the jury was "to take to be factually correct without the need to hear additional testimony or evidence[.]" At the conclusion of the first phase of the trial, the jury found that Fitzgerald Farms was entitled to punitive damages. The case then proceeded to the second phase to determine the amount of punitive damages, with the jury returning a verdict of $500,000 in punitive damages for Fitzgerald Farms and indicating that attorney fees were warranted. The third phase of the trial was then initiated to determine the amount of attorney fees, which the jury found to be $200,000. This appeal followed.

1. Whitaker Farms contests the denial of two of its motions in limine.

(a) First, Whitaker Farms argues that the trial court erred in admitting statements made during a settlement conference. At trial, Lennon testified that, before his deposition, he met with Curtis one-on-one with their attorney's knowledge. Lennon expected that the two would "come away with an agreement, a settlement . . ." and asked if the two could just walk away from the dispute, each paying their own costs. After the conversation began cordially, Curtis reminded Lennon about Curtis seeking a criminal arrest warrant against Lennon for trespassing on his property, and

told Lennon that he "thrived off this type of litigation" and had bankrupted a person in the past. Curtis also commented that Lennon had made him very angry and Curtis was going to make an example out of Lennon. Curtis testified that Lennon's account of the conversation was "unequivocally not true." Rather, Curtis stated that they reached a tentative agreement where Lennon would pay him annually for the orchard, but the deal never came to fruition.

Whitaker Farms argues that this testimony was inadmissible under OCGA § 24-4-408 (b) and OCGA § 24-4-403 because the discussion was not relevant to Curtis's intent at the time of the tortious action (the locking of the gate) and was extremely prejudicial to its case, as it formed a central part of Fitzgerald Farms's case.

OCGA § 24-4-408 (b) states: "Evidence of conduct or statements made in compromise negotiations or mediation shall not be admissible." The statute, however, "shall not require exclusion of evidence offered for another purpose, including, but not limited to, proving bias or prejudice of a witness, negating a contention of undue delay or abuse of process, or proving an effort to obstruct a criminal investigation or prosecution." OCGA § 24-4-408 (c). And "[b]y its terms, the rule forbids admission of evidence only when it is offered to prove liability for or invalidity of the claim or its amount." *Zurich American Ins. Co. v. Watts Indus., Inc.*, 417 F3d 682, 689 II (B)

8

(7th Cir. 2005) (citation and punctuation omitted).[2] See also *Christie v. Rainmaster Irrigation, Inc.*, 299 Ga. App. 383, 390 (5) (682 SE2d 687) (2009) (applying the same principles to Georgia's previous version of the statute, OCGA § 24-3-37). Accordingly, evidence coming out of settlement negotiations is admissible for other purposes, including to show knowledge and intent. *Zurich*, 417 F3d at 689 II (B).

Here, where the trial court allowed the admission of Curtis's statements during something akin to a settlement negotiation for the limited purpose of proving Curtis's intent and state of mind,[3] there was no abuse of discretion. See *Efstathiou v. Reiss*, 227 Ga. App. 735, 737 (4) (490 SE2d 426) (1997) (reviewing for abuse of discretion the trial court's decision to allow testimony referencing settlement negotiations in order to bring the witness's attention to a particular point in time). This is not a case where Curtis's admissions during the course of a settlement negotiation were used

---

[2] Georgia courts follow federal guidance in interpreting Georgia's rules of evidence. See *State v. Almanza*, 304 Ga. 553, 558 (2) (820 SE2d 1) (2018) ("The General Assembly was crystal clear in conveying its intent that Georgia's new Evidence Code was primarily enacted to adopt the Federal Rules of Evidence.")

[3] Indeed, during the jury charge, the trial court instructed the jury that all of the evidence they heard concerning Curtis's conduct after the lockout was "admitted for the sole purpose of demonstrating, if it does, [Curtis's] intent to commit the tort of trespass and whether [Curtis's] state of mind or motivations in connection with that tort meet the punitive damages standard."

against him to prove his liability; rather, his demeanor was used as evidence of his state of mind toward Lennon, which was relevant to the jury's consideration of whether to award punitive damages. See *Cox v. Mayan Lagoon Estates, Ltd*, 319 Ga. App. 101, 104 (1) (b) (734 SE2d 883) (2012) (explaining that the purpose of the former version of this rule, OCGA § 24-3-37, was to encourage settlements by allowing parties to make admissions towards compromise).

We also find no abuse of discretion under OCGA § 24-4-403, which states: "Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "[T]he exercise of discretion under Rule 403 is case-specific and usually turns on the trial court's assessment of the probative value and prejudicial effect of the particular evidence at issue." *Nails v. State*, 357 Ga. App. 515, 519 (1) (851 SE2d 144) (2020) (citation and punctuation omitted). See also *Cannon v. Barnes*, 357 Ga. App. 228, 230 (1) (850 SE2d 436) (2020) ("the balancing test of OCGA § 24-4-403 . . . is a quintessentially fact-sensitive enterprise, and the trial judge is in the best position to make such factbound assessments. Recognizing that coign of vantage, we typically give the [trial] court wide latitude when evaluating the

10

delicate balance that Rule 403 requires"). Here, where the trial court found the evidence at issue relevant to Curtis's intent as it related to the punitive damages standard, and instructed the jury to that end, we find no abuse of discretion.

(b) Whitaker Farms also asserts that the trial court's ruling to allow evidence of the condition of the property months and years after the lockout incident was erroneous, specifically arguing that the evidence was inadmissible under Rule 403 because it was not relevant to the issue of whether Curtis's actions at the time of the trespass were worthy of punitive damages and it unfairly prejudiced Whitaker Farms by portraying Curtis as a poor steward of the land.

At trial, Lennon testified about his observations of the peach orchard in spring 2017, the year after the lockout. He testified that Whitaker Farms was not taking care of the crop and had cut the trees "to the point that they ruined the trees." The jury was shown pictures of the trees from when Lennon was tending the orchard to compare to the trees afterwards.

Here, Fitzgerald Farms's theory of recovery was that Curtis and Whitaker Farms should be liable for punitive damages because Curtis had malicious and bad faith intentions when refusing Lennon access to the property. According to this theory, Whitaker Farms's non-interest in harvesting the peaches it so forcefully kept

11

away from Lennon showed its malice towards Fitzgerald Farms, as opposed to a good faith effort to protect its own crops. Indeed, Whitaker Farms's defense to the punitive damages allegations was that it was acting only to protect its land and crops from damage from a trespasser. As evidence relevant to a key issue, we see no abuse of discretion in the trial court's decision to allow this evidence to be presented to the jury. See *Murphy v. McCaughey*, 262 Ga. App. 570, 573 (3) (586 SE2d 16) (2003) ("all evidence that throws light on a material issue in the case should be admitted unless its potential for prejudice outweighs its possible probative value").

2. Whitaker Farms next contests the trial court's instructions to the jury to take certain facts as established. As described above, at the outset of the trial, the court read 27 facts that the jury was to accept as true without the need to hear additional evidence. Most of these facts were taken directly from *Whitaker I*, 347 Ga. App. at 381-384. Whitaker Farms argues that the statement of facts from *Whitaker I* does not constitute the "law of the case" because we cannot know what the jury actually found in the first trial. Rather, our opinion constituted merely a statement of the facts that *could have* authorized the jury's verdict, with the evidence viewed in the verdict's favor as required on appellate review. Whitaker Farms argues that stating the facts to the jury saved no time in the second trial, as all but one witness from the first trial was

called to testify at the second trial, and it suffered prejudice because some of the stated facts were disputed or contrary to actual evidence.

Here, under the law of the case, as established in *Whitaker I*, neither Whitaker Farms nor the jury could revisit the issue of Whitaker Farms's liability for trespass against Fitzgerald Farms. See *Kent v. A.O. White*, 253 Ga. App. 492, 493 (1) (559 SE2d 731) (2002). In order to affirm the jury's liability verdict in the first trial, we held that the evidence showed that:

> [Curtis] knew that (a) Lennon had occupied the Baby Gold orchard and harvested peaches on it for at least a decade; (b) Hynes had locked the gates of the peach orchard where Fitzgerald Farms was harvesting its peaches; and (c) any delay in harvesting could result in destruction of the crop. Nevertheless, [Curtis] neither instructed Hynes to unlock the gates on August 4 — thus allowing Lennon and his workers to return to the property — nor stopped Hynes from relocking the gate the following morning. Instead, [Curtis] ignored Lennon's phone call and Fitzgerald Farms'[s] complaint for a temporary restraining order, and proceeded to file a criminal arrest warrant against Lennon to keep him off the property.

*Whitaker I*, 347 Ga. App. at 386 (1). These findings were required to meet the standard for imputing liability to Curtis and Whitaker Farms from Hynes's actions, as the jury had to find that Curtis ratified Hynes's wrongful conduct in order to hold

13

Whitaker Farms accountable for its employee's actions. Id. at 385-386 (1). Without these findings, we would not have been able to affirm the jury's first verdict.

Accordingly, the factual statements with which Whitaker Farms takes issue were properly included as law of the case to the jury, as they were part and parcel of the jury's trespass verdict that could not be re-litigated. And the record supports the trial court's decision that such direction to the jury was necessary. As is clear from Whitaker Farms's statement of the issues for the second trial in the consolidated pre-trial order, Whitaker Farms intended to relitigate its liability for the trespass, including statements that Curtis had no knowledge that Fitzgerald Farms had any right to access the property, characterizing Fitzgerald Farms's trespass damages as mere claims of purported trespass. Further, the trial court, when reading these factual statements to the jury, put them in context by making it clear what the purpose of the second trial was — to decide the limited and sole issue of whether or not punitive damages should be awarded in the case. Thus, we see no reversible error in the trial court's actions. See *Kent*, 253 Ga. App. at 493 (1) (affirming second jury verdict where trial court read appellate opinion to the second jury; "[t]o charge the jury on the law, and even the facts, as affirmed on appeal is not reversible error where such facts have been precluded from relitigation under the law of the case").

14

3. Whitaker Farms's next two claims of error —that "in light of its erroneous evidentiary rulings" and "[w]ithout the improper evidence" introduced at trial, the trial court erred in failing to grant a direct verdict — are based on the premise that the trial court's evidentiary rulings were error, and thus meritless based on our discussion above.

4. In related claims of error, Whitaker Farms contests the trial court's charging of the jury during the first phase of the trial. Punitive damages cases are tried in two parts; first, the jury must decide if punitive damages are warranted by the evidence. OCGA § 51-12-5.1 (d) (1). If yes, "the trial shall immediately be recommenced in order to receive such evidence as is relevant to a decision regarding what amount of damages will be sufficient to deter, penalize, or punish the defendant in light of the circumstances of the case." OCGA § 51-12-5.1 (d) (2). In this case, the trial court charged the jury during the first phase of the trial that it was to determine whether to impose punitive damages against Whitaker Farms. After stating Fitzgerald Farms's burden of proof (clear and convincing evidence) and the general requirements to find punitive damages, the trial court went on to instruct the jury that, "[i]f you decide to impose punitive damages, you should further specify whether you find that the

15

defendant acted with specific intent to cause harm."[4] The trial court instructed the jury that they need only find specific intent to harm by a preponderance of the evidence but that the defendant must be found to have been active, as opposed to passive, in committing the wrong that caused the harm.

Whitaker Farms asserts that the trial court erred in allowing uncapped punitive damages because Whitaker Farms was not an "active tortfeasor"; Hynes was the only active tortfeasor. Whitaker Farms also argues that it was error to include instructions concerning specific intent to harm in the first phase of the trial, as it was not relevant to the first question of whether punitive damages should be awarded at all, and it introduced a lower burden of proof that could have confused the jury as to their obligations.

---

[4] This language comes from the same statute covering punitive damages:

> if it is found that the defendant acted, or failed to act, with the specific intent to cause harm . . . there shall be no limitation regarding the amount which may be awarded as punitive damages against an active tort-feasor but such damages shall not be the liability of any defendant other than an active tort-feasor.

OCGA § 51-12-5.1 (f). It is also found in Georgia's pattern jury instructions. Suggested Pattern Jury Instructions, Vol. I: Civil Case (2022), § 66.711.

16

We agree with Fitzgerald Farms that Whitaker Farms could be considered an active tortfeasor in light of the facts of this case. The trial court instructed the jury that, to find specific intent to harm that would ultimately lead to uncapped punitive damages, it would have to find that Whitker Farms was active, rather than passive in committing the wrong that cause the harm to Fitzgerald Farms. In a trespass case, "[e]very act which unlawfully interferes with a private property owner's absolute right to enjoy its property is a tort for which an action shall lie." *Pope v. Pulte Home Corp.*, 246 Ga. App. 120, 120 (1) (539 SE2d 842) (2000). Thus, evidence showing that Whitaker Farms acted after the initial lockout to keep Lennon and his workers off the property would authorize the jury's finding that it was an active tortfeasor in this case.

Further, we see no reversible error in the trial court's instructing the jury on specific intent to cause harm in the first phase of the trial. "The review of allegedly erroneous jury instructions is a legal question, and we therefore owe no deference to the trial court's ruling and apply the 'plain legal error' standard of review." *City of College Park v. City of Sandersville*, 361 Ga. App. 529, 533 (4) (864 SE2d 680) (2021) (citation and punctuation omitted). Here, the trial court's instructions were not inaccurate, and there is no indication that the jury was in fact confused by the burdens

17

of proof stated for different findings. See id. ("Upon review, jury instructions must be read and considered as a whole in determining whether the charge contained error. Challenged segments cannot be considered in isolation to ascertain whether the charge is accurate and fair and worked no prejudice to the complaining party.") (citation and punctuation omitted). And we must assume that the jury followed the instructions as given concerning the burdens of proof for different findings. *City of Lawrenceville v. Alford*, 366 Ga. App. 226, 228 (1) (881 SE2d 474) (2022). Accordingly, we see no prejudice to Whitaker Farms based on the trial court's jury instructions. See *Fassnacht v. Moler*, 358 Ga. App. 463, 474-475 (1) (b) (855 SE2d 692) (2021) (trial court's alleged error in instructing the jury on specific intent to cause harm during Phase I of a punitive damages trial was not a substantial error harmful as a matter of law because there was no indication that the jury charge was confusing or misleading to the jury). Accordingly, we affirm the jury's verdict for punitive damages in this case.

*Judgment affirmed. Doyle, P. J., and Senior Appellate Judge Herbert E. Phipps concur.*